**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION**

| | |
|---|---|
| TITLEMAX OF SOUTH CAROLINA, INC. <br><br> Plaintiff, <br><br> v. <br><br> BRANDON HALIK, ROTANZA HURT, ERIC HURD, and STATE OF NORTH CAROLINA <br><br> Defendants. | Civil Action No. |

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

1.     Plaintiff TitleMax of South Carolina, Inc. ("TM-SC"), by and through its undersigned counsel, brings this action against Defendants the Attorney General of North Carolina (the "North Carolina Attorney General") and individuals Brandon Halik, Rotanza Hurt, and Eric Hurd (collectively, the "Individual Defendants"), for declaratory judgment under 28 U.S.C. § 2201 and Fed. R. Civ. P. 47. Specifically, TM-SC seeks a declaration, with corresponding injunctive relief, that:

(i)     the North Carolina Consumer Finance Act (N.C. Gen. Stat. § 53-165, *et seq.*) (the "NC Finance Act"), North Carolina usury law (N.C. Gen. Stat. §§ 24-1.1, *et seq.*) ("NC Usury Law"), and/or the North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. §§ 75-1.1, *et seq.*) (the "NC UDTPA") violate, on their face and as applied to TM-SC's consumer loans to the Individual Defendants, the United States Constitution; and, therefore,

(ii)    the consumer loans TM-SC made to the Individual Defendants are not subject to, invalidated by, or in violation of those unconstitutional North Carolina laws.

2.    The North Carolina Attorney General has threatened enforcement of the unconstitutional North Carolina statutes against out-of-state lenders like TM-SC. TM-SC thus faces the concrete, particularized and imminent harm of state enforcement of the unconstitutional statutes. TM-SC is entitled to a declaration from this Court that the statutes are unconstitutional on their face in order to redress the imminent threat of enforcement.

3.    The Individual Defendants are pursuing arbitrations against TM-SC, alleging that TM-SC violated the unconstitutional North Carolina statutes. The arbitrators in those actions are not empowered to rule on the constitutionality of these statutes. That power is vested solely in the judicial branch. Indeed, counsel for the Individual Defendants has argued in arbitration that: "[a]ctively changing current law or declaring statutes unconstitutional is not in the province of an arbitrator" and "[u]nless and until a court of competent jurisdiction declares the North Carolina Consumer Finance Act unconstitutional the Act is good law that controls Claimant's claims. TM-SC has and continues to have that choice to pursue."

4.    TM-SC thus faces the concrete, particularized and imminent harm of being compelled to pay statutory damages and penalties to the Individual Defendants under unconstitutional statutes.

5.    TM-SC is entitled to a declaration from this Court that the statutes are unconstitutional as applied to its loans to the Individual Defendants in order to redress the imminent threat of civil liability. *See Joe Hand Promotions, Inc. v. Hayes*, No. 1:18CV531, 2019 WL 4246646 (M.D.N.C. Sept. 6, 2019); *Noatex Corp. v. King Const. of Houston, L.L.C.,* 732 F.3d 479, 484 (5th Cir. 2013); *J & J Sports Prods., Inc. v. Dean*, No. 10-05088 CW, 2011 WL 4080052,

at *5 (N.D. Cal. Sept. 12, 2011); *J & J Sports Prods., Inc. v. Patin*, 358 F. Supp. 3d 318, 322 (S.D.N.Y. 2019).

## PARTIES, JURISDICTION, AND VENUE

6.     TM-SC is a South Carolina corporation with its principal place of business in Texas at 2312 East Trinity Mills Road, Carrollton, TX 75006. It has no North Carolina presence.

7.     Upon information and belief, Defendant Brandon Halik is a resident of New Hanover County, North Carolina.

8.     Upon information and belief, Defendant Rotanza Hurt is a resident of Hoke County, North Carolina.

9.     Upon information and belief, Defendant Eric Hurd is a resident of Gaston County, North Carolina

10.     The Attorney General of North Carolina is named as a Defendant because TM-SC seeks a declaration from the Court that certain North Carolina statutes violate the United States Constitution and injunctive relief against the North Carolina Attorney General's threatened enforcement of those statutes.

11.     The relevant statutes contemplate enforcement by the North Carolina Attorney General (*see*, *e.g.*, N.C. Gen. Stat. §§ 75-15.1–2, 53-166), and the North Carolina Attorney General has not indicated affirmatively that they will not enforce the statute.

12.     To the contrary, the North Carolina Attorney General has previously intervened in a related case in this District for the express purpose of defending the constitutionality of the same statutes challenged in this action. *See*, e.g., *Auto Money North LLC v. Walters et al.*, Case No. 23-CV-02952-JDA, Dkt. No. 38 (Jan. 4, 2024). In a related press release, the North Carolina Attorney General indicated the State's intent to continue to enforce the statutes. *See Attorney General Stein*

*Fights to Protect North Carolinians from High Interest Loans* (Feb. 22, 2024) ("'We kicked predatory, payday, and car title lenders out of North Carolina years ago, and we're not letting them back in,' said Attorney General Josh Stein. 'I will not let this lender or others levy illegal high interest loans against North Carolinians.'"), *available at* https://ncdoj.gov/attorney-general-stein-fights-to-protect-north-carolinians-from-high-interest-loans/. By its own admission and by its affirmative decision to intervene in the *Auto Money North* case, the North Carolina Attorney General seeks to promote enforcement of the unconstitutional NC laws against out-of-state lenders like TM-SC.

13.     TM-SC moved to intervene in that case to assert the present claims on July 1, 2024. *Id.*, Dkt. No. 96. Briefing was completed on that motion on July 22, 2024. *Id.*, Dkt. No. 100. However, prior to ruling on the motion to intervene, the *Auto Money* court stayed proceedings through at least October 18, 2024 "to allow the parties an opportunity to reach final settlement[,]" necessitating the filing of this lawsuit. *Id.*, Dkt. No. 117. The case was dismissed without prejudice on April 17, 2025. *Id.*, Dkt No. 124.

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.00.

15.     Alternatively, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 2201, as the Complaint asserts claims arising under the Constitution and the laws of the United States, and it seeks a declaration of rights and other legal relations and appropriate injunctive relief under the Constitution and the laws of the United States.

16.     At a minimum, this Court has original jurisdiction over TM-SC's claims against the North Carolina Attorney General pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over TM-SC's claims against the Individual Defendants under 28 U.S.C. § 1367 because those

claims form part of the same case or controversy as TM-SC's claims against the North Carolina Attorney General.

17. Venue is proper in South Carolina under 28 U.S.C. § 1391(b)(2) because all acts giving rise to the relationships and agreements between the parties and all claims at issue took place in South Carolina.

18. This Court has personal jurisdiction over the Individual Defendants in that the actions of the Individual Defendants giving rise to this Complaint all occurred in South Carolina. More specifically, and among other things, the Individual Defendants voluntarily traveled to TM-SC's stores in South Carolina for the purpose of negotiating, applying for, and entering into the relevant loan agreements with TM-SC.

19. Likewise, this Court has personal jurisdiction over the North Carolina Attorney General on account of the Attorney General's actions directed towards the State of South Carolina, including, among other things, the Attorney General's threatened enforcement of unconstitutional North Carolina statutes against out-of-state actors, including those located and operating solely within South Carolina, on the basis of acts taking place outside of North Carolina, and its appearance in South Carolina to defend the constitutionality of those North Carolina statutes.

20. TM-SC files this declaratory judgment action to determine the parties' rights and liabilities to each other.

21. This Court's declaration as to the legal relationship between the parties and as to the interplay between state law and the U.S. Constitution will clarify unsettled legal issues between the parties and as to similarly situated customers of TM-SC.

22. This Court has a substantial public interest in determining the issues presented by this Complaint. TM-SC (as well as other similarly situated title lenders) is a licensed supervised

lender regulated by the South Carolina Board of Financial Institutions, Division of Consumer Finance, and Department of Consumer Affairs and, at all times relevant to this action, operated in compliance with applicable South Carolina law and entirely within South Carolina's borders. The Individual Defendants, however, have sued TM-SC in North Carolina state court, *Ray et al. v. TitleMax of Virginia, Inc. et al.*, 24CV011277-400 (Guilford County, N.C.) (the "N.C. State Case") and *Boone et al. v. TtitleMax of Virginia, Inc. et al,* 1:25-cv-00055 (M.D.N.C.) (the "N.C. Federal Case."). While the Individual Defendants' claims in the N.C. State Case and the N.C. Federal Case have since been compelled to arbitration on their own motion, the Individual Defendants are, through those arbitrations, attempting to use the unconstitutional North Carolina laws, in an unconstitutional manner, to punish and penalize TM-SC for, and to prevent TM-SC from, operating its lawful business in compliance with South Carolina's laws and inside its borders.

23.     This Court also has a substantial public interest in determining the issues presented by this Complaint because the Attorney General of North Carolina has threatened enforcement of the unconstitutional North Carolina Statutes against out-of-state actors, including lenders located and operating solely within South Carolina, on the basis of acts taking place in South Carolina.

## FACTS

24.     TM-SC is a regulated lending entity that makes consumer loans as a "supervised lender" under South Carolina statute. Specifically, TM-SC makes consumer loans secured by vehicle titles—commonly referred to as "title-secured loans." Title-secured loans made by TM-SC are "supervised loans," subject to auditing and inspection by the Consumer Finance Division of the South Carolina Board of Financial Institutions and the South Carolina Department of Consumer Affairs.

25.     TM-SC holds an individual branch supervised lending license for each of its store locations, which has been issued by the South Carolina Board of Financial Institutions, Division of Consumer Finance, as well as a Maximum rate schedule and a Consumer Credit Grantor notification issued by the South Carolina Department of Consumer Affairs. TM-SC has this license displayed prominently on the interior wall of the corresponding store location in South Carolina.

26.     TM-SC currently operates the locations from which the Individual Defendants obtained their loans, which are physically located in South Carolina.

27.     TM-SC does not make loans within the State of North Carolina.

a.     It does not have any store locations in North Carolina.

b.     It does not maintain employees or agents in North Carolina.

c.     It does not have bank accounts in North Carolina.

d.     It does not direct any marketing or advertising at North Carolina.

e.     It does not negotiate loans or make offers to lend money over the phone, email, or the internet with North Carolina customers.

f.     It does not execute any loan documents in North Carolina.

g.     It does not have any physical offices to accept loan payments in North Carolina.

h.     Nothing on the TM-SC website—http://www.titlemax.com—is directed towards North Carolina residents. In fact, a search on the TM-SC website for the phrase "North Carolina" in quotations returns zero results. The website makes clear TM-SC has no physical locations in North Carolina, and persons in North Carolina do not qualify for any online-only loan offerings.

       i.    TM-SC does not repossess, nor does it request repossession by independent third-party recovery vendors of any vehicles within the geographic boundaries of North Carolina.

28.    TM-SC only makes loans within the state of South Carolina as required by governing South Carolina law.

    a.    All loan applications, including those of the Individual Defendants, are made in person and physically in the state of South Carolina.

    b.    TM-SC makes all loan offers in person and physically in the state of South Carolina, including the offers made to the Individual Defendants, and all discussions and negotiations occur in South Carolina.

    c.    The parties (including the Individual Defendants) execute all title loan documents physically in South Carolina.

    d.    TM-SC only disburses funds to borrowers, including the loan proceeds disbursed to the Individual Defendants, physically in South Carolina.

    e.    TM-SC only receives payment from borrowers (including the Individual Defendants) in South Carolina.

    f.    TM-SC does not personally solicit, while physically present in North Carolina, any borrowers, and did not personally solicit, while physically present in North Carolina, any of the Individual Defendants, to enter into any loan agreements with TM-SC.

29.    TM-SC's sole, limited contacts with the State of North Carolina related to Individual Defendants are that, on information and belief, Individual Defendants may have sent payments from North Carolina to TM-SC in South Carolina (TM-SC received those payments

exclusively in South Carolina), and TM-SC filled out the requisite forms to record some liens perfecting their security interests as a matter of course. These payments and recordings, however, took place after the Individual Defendants crossed borders and the relevant parties fully executed their respective loan agreements in South Carolina.

## SPECIFIC FACTS RELATED TO
## THE INDIVIDUAL DEFENDANTS' LOAN AGREEMENTS

30.     Defendant Brandon Halik voluntarily traveled to TM-SC's location in Little River, South Carolina, where in the TM-SC location wholly in South Carolina, he negotiated, applied to borrow, and accepted a loan offer from TM-SC with a security interest in the title to his vehicle.

31.     Defendant Halik's loan had a principal amount of $5,140.00, and to date, he has made payments to TM-SC totaling $22,046.44. Defendant Halik's loan has been paid off as of 11/17/2021.

32.     Defendant Rotanza Hurt voluntarily traveled to TM-SC's location in Dillon, South Carolina, where in the TM-SC location wholly in South Carolina, she negotiated, applied to borrow, and accepted a loan offer from TM-SC with a security interest in the title to her vehicle.

33.     Defendant Hurt's loan had a principal amount of $10,020.00 and to date, she has made payments to TM-SC totaling $42,295.62. Defendant Hurt's loan has been paid off as of 04/26/2022.

34.     Defendant Eric Hurd voluntarily traveled to TM-SC's location in Fort Mill, South Carolina, where in the TM-SC location wholly in South Carolina, he negotiated, applied to borrow, and accepted five loan offers from TM-SC with a security interest in the titles to his vehicles.

35.     Defendant Hurd's loans had a principal amounts totaling $26,866.66, and to date, he has made payments to TM-SC totaling $30,049.84. Defendant Hurd's loans have been paid off as of 07/05/2018.

36.     While the Individual Defendants were present at TM-SC's store locations in Little River, Dillon, and Fort Mill South Carolina, they completed customer applications for title loans. TM-SC reviewed the customer applications, appraised and photographed the Individual Defendants' vehicles, negotiated the terms of the title loans, and prepared the supervised loan agreements, promissory notes, security agreements and any and all other documents relating to the loans. The Individual Defendants then executed all documents pertaining to their respective loans in South Carolina.

37.     All the foregoing activities, including the offer, negotiation, acceptance and execution of the loan documents physically occurred on-site at TM-SC's locations in Little River, Dillon, and Fort Mill South Carolina.

38.     Additionally, to apply for a loan with TM-SC, an applicant must provide: identification, a completed loan application, and the vehicle's title. TM-SC only accepts these items in person at its locations in South Carolina. The Individual Defendants provided these items in person at TM-SC's locations in Little River, Dillon, and Fort Mill South Carolina.

39.     Before determining the actual amount of a title loan, TM-SC must also appraise the vehicle. Again, TM-SC only conducts appraisals physically at its locations in South Carolina. The appraisals of the Individual Defendants' vehicles were done at TM-SC's locations in Little River, Dillon, and Fort Mill South Carolina.

40.     On or about May 15, 2024, Halik and Hurt and others filed the NC State Case against TM-SC in Guilford County, North Carolina. They allege that TM-SC's loan agreements with the Individual Defendants are unenforceable because they violate the NC Consumer Finance Act, the NC Usury Law, and the NC UDTPA, and that TM-SC is liable to each Defendant for, *inter alia*, treble damages, punitive damages of at least $25,000, interest, and attorney's fees.

41.     TM-SC moved to dismiss the NC State Case for lack of personal jurisdiction, but the North Carolina trial court denied TM-SC's motion to dismiss and, on Halik and Hurts' Motion, ordered their claims to arbitration. While the North Carolina trial court's finding of personal jurisdiction over TM-SC (which was the jurisdictional predicate for the trial court's subsequent order compelling arbitration) is on appeal with the North Carolina Court of Appeals, Halik and Hurt filed arbitration demands against TM-SC.

42.     On or about December 12, 2024,  Hurd and others filed the NC Federal Case against TM-SC in Guilford County, North Carolina. On January 27, 2025, TM-SC and others removed the action to the Middle District of North Carolina. Like Halik and Hurt, Hurd alleges that TM-SC's loan agreements with him are unenforceable because they violate the NC Consumer Finance Act, the NC Usury Law, and the NC UDTPA, and that TM-SC is liable to Hurd for, *inter alia*, treble damages, punitive damages of at least $25,000, interest, and attorney's fees.

43.     TM-SC moved to dismiss the NC Federal Case for lack of personal jurisdiction, but the Middle District of North Carolina denied TM-SC's motion to dismiss and, on Hurd's Motion, ordered his claims to arbitration. The trial court's finding of personal jurisdiction over TM-SC (which was the jurisdictional predicate for the trial court's subsequent order compelling arbitration) is not yet appealable.

44.     In the arbitration actions filed by Halik, Hurt, and Hurd, the arbitrators do not have the power of judicial review of the constitutionality of the North Carolina statutes. The core constitutional principle of judicial review cannot be stripped from the judiciary and given to private citizens, as it is integral to the structure of the federal system. Thus, the constitutionality of these statutes must be decided by the Court.

45.     Notably, if any of the arbitrations result in an award that is confirmed and enforced against TM-SC, TM-SC will be deprived of its right to adequately challenge and to have decided by this Court whether the North Carolina laws violate the United States Constitution.

**OVERVIEW OF SOUTH CAROLINA CONSUMER LENDING LAWS**

46.     The South Carolina Consumer Protection Code (S.C. Code. Ann. § 37- 3-101, *et seq.*) (the "SC Consumer Protection Code") applies to all consumer loans made in South Carolina, including supervised loans. *See* S.C. Code Ann. § 37-3-102.

47.     Section 37-3-104 of the SC Consumer Protection Code defines a "consumer loan" as: a loan made by a person regularly engaged in the business of making loans in which:

     a.     the debtor is a person other than an organization;

     b.     the debt is incurred primarily for a personal, family, or household purpose;

     c.     either the debt is payable in installments or a loan finance charge is made; and

     d.     either the principal does not exceed twenty-five thousand dollars or the debt is secured by an interest in land.

48.     Title-secured loans issued by TM-SC, including those issued to the Individual Defendants, are "consumer loans" under South Carolina law. They are:

     a.   a loan to a person, rather than an organization;

     b.   incurred for primarily personal, family, or household purposes;

     c.   debts payable in installments; and

     d.   for a principal amount below the $25,000 statutory limit and not secured by land.

49.     The South Carolina Consumer Protection Code also regulates consumer loans as "supervised loans" under Part 5, S.C. Code. Ann. §§ 37-3-500 through 37-3-515.

50.     Section 37-3-501(1) defines a "supervised loan" as "a consumer loan in which the rate of the loan finance charge exceeds twelve percent per year as determined according to the provisions on the loan finance charge for consumer loans."

51.     The term "loan finance charge," defined at S.C. Code Ann. § 37-3- 109(1)(a), includes:

All charges payable directly or indirectly by the debtor and imposed directly or indirectly by the lender as an incident to the extension of credit, including any of the following types of charges which are applicable: interest or any amount payable under a point, discount or other system of charges, however denominated, premium or other charge for any guarantee or insurance protecting the lender against the debtor's default or other credit loss, and, except as otherwise provided in this section….

52.     However, S.C. Code Ann. § 37-3-501(1) excludes from the definition of a "supervised loan":

a.     a mortgage loan as defined in Section 37-22-110(30); or a closed end credit transaction, with an original repayment term of less than one hundred twenty days, unsecured by any interest in the consumer's personal property or secured by personal property, excluding motor vehicles that are free of any other liens or encumbrances, that does not have a market value that reasonably secures the amount of the loan, and the consumer:

i.     receives funds from and incurs interest or a fee payable to a creditor, and contemporaneously with, or any time after, the receipt of funds, provides a check or other payment instrument to the creditor who

agrees with the consumer not to deposit or present the check or payment instrument; or

ii.    receives funds from and incurs interest or a fee payable to a creditor, and contemporaneously with, or any time after, the receipt of funds, authorizes the creditor to initiate a debit or debits to the consumer's deposit account by electronic fund transfer or a remotely created check or remotely created consumer item as defined in Section 36-3-103(16).

53.    Under this definition, the title-secured loans issued by TM-SC, including those issued to the Individual Defendants, are "supervised loans." They are made for the personal use of consumers, are subject to loan finance charges which exceed twelve percent, are secured by motor vehicle titles, are not under secured, and are payable over a two-year period. They do not fall under any of the exclusions set forth in S.C. Code Ann. § 37-3-501(1).

54.    Under the South Carolina Consumer Protection Code, only a supervised financial organization or a licensed "supervised lender" may make supervised loans. S.C. Code Ann. § 37-3-502; see also S.C. Code Ann. § 37-3-501(2) (defining "supervised lender" as a "person authorized to make or take assignments of supervised loans").

55.    A supervised lender license can only be issued after the requesting party applies for, and otherwise qualifies to receive, a license. S.C. Code Ann. § 37-5-503. Maintaining a supervised lender license requires satisfying specific reporting requirements (as set forth in S.C. Code Ann. § 37-3- 505), remaining subject to examination and investigation by the State Board of Financial Institutions (as set forth in S.C. Code Ann. § 37-3-506), and otherwise complying with the South Carolina Consumer Protection Code.

56.     If a supervised lender, like TM-SC, operates from multiple locations, it must maintain a separate license for each location. *See* S.C. Code Ann. § 37-3-503(4).

57.     The Individual Defendants executed their title loans while physically present at TM-SC's locations in Dillon Little River, and Fort Mill South Carolina, which at all times relevant, held a valid supervised lender license.

58.     Under S.C. Code Ann. § 37-3-305, all supervised lenders located within the State of South Carolina must file a rate schedule indicating the maximum interest charged to any borrower with the South Carolina Department of Consumer Affairs and post the filed maximum rate schedule in a conspicuous place in the location where the loan contracts are executed. Such filing and posting must be completed for each location, and the filing of the maximum rate is an annual requirement. S.C. Code Ann. § 37-3-305(7). All on-site rate postings must include the below language in at least fourteen-point font:

> Consumers: All supervised and restricted creditors making consumer loans in South Carolina are required by law to post a schedule showing the maximum rate of LOAN FINANCE CHARGES stated as ANNUAL PERCENTAGE RATES that the creditor intends to charge for various types of consumer credit transactions.
>
> The purpose of this requirement is to assist you in comparing the maximum rates that creditors charge, thereby furthering your understanding of the terms of consumer credit transactions and helping you to avoid the uninformed use of credit.
>
> NOTE: Creditors are prohibited only from granting consumer credit at rates higher than those specified above. A creditor may be willing to grant you credit at rates that are lower than those specified, depending on the amount, terms, collateral and your credit worthiness.
>
> S.C. Code Ann. § 37-3-305(3).

59.    At all times relevant, TM-SC's Dillon, Little River, and Fort Mill stores satisfied the above filing and posting requirements for their maximum rate schedule, which indicated that loans issued by that location could have an interest rate of up to 300%.[1] The 300% maximum rate has been the customary maximum rate filed and maintained by all of TM-SC's locations at all relevant times. The State of South Carolina approved the maximum rate schedules for these locations. TM-SC posted certificates of those rates at each of its locations.

60.    The South Carolina Consumer Protection Code further provides specific, more stringent provisions for "short term vehicle secured loans," which are nonpurchase money consumer loans secured by vehicle titles with an original repayment period of greater than one month and less than 120 days. S.C. Code Ann. §§ 37-3-413(1) & (2). Short term vehicle secured loans may be renewed for up to 240 days from the original date of the loan. S.C. Code Ann. § 37-3-413(2).

61.    Short term vehicle secured loans are governed by stricter regulations than ordinary supervised loans. Lenders must require borrowers to provide information on employment, income, and expenses; borrowers must sign a statement attesting to their ability to repay the amount borrowed; lenders may not loan any amount greater than the fair market value of the collateral vehicle; and loan documents must include a conspicuous notice in fourteen-point font stating: "THIS IS A HIGHER INTEREST LOAN. YOU SHOULD GO TO ANOTHER SOURCE IF YOU HAVE THE ABILITY TO BORROW AT A LOWER RATE OF INTEREST. YOU ARE PLACING YOUR VEHICLE AT RISK IF YOU DEFAULT ON THIS LOAN." S.C. Code Ann. §§ 37-3-413(3), (4), and (6)(a).

---

[1] Defendant Hurt's loans have interest rates of 95.32% to 96.11%; Defendant Halik's loans have interest rates of 152.27% to 156.04%; Defendant Hurd's loans have interest rates of 119.99% to 144.43%.

62. TM-SC's loans to the Individual Defendants are not "short term vehicle secured loans" under the South Carolina Consumer Protection Code because they are for a two-year period. However, even though TM-SC's loans to the Individual Defendants are not "short term vehicle secured loans," the Individual Defendants were asked to submit employment and financial information as part of the application process. Additionally, the loans did not exceed the fair market value of the collateral, and the Loan Agreements included similar notices to the "higher interest rate" notice set out above.

63. As a regulated supervised lender, TM-SC has at all relevant times complied with, and continues to comply with, the South Carolina licensing and consumer protection laws in the operation of its locations.

## STATUTORY PREDICATES FOR CAUSES OF ACTION BELOW

64. The North Carolina legislature enacted the challenged statutes, which purport to regulate TM-SC's conduct in South Carolina. Thus, the instant dispute involves state action that threatens to injure TM-SC via the Individual Defendants' claims as against TM-SC under these statutes and the North Carolina Attorney General's threatened enforcement of the statutes.

65. N.C. Gen. Stat. § 53-190, entitled "Loans Made Elsewhere" states:

(a) "No loan contract made outside this State in the amount or of the value of twenty-five thousand dollars ($25,000) or less, for which greater consideration or charges than are authorized by N.C. Gen. Stat. § 53-173 and N.C. Gen. Stat. § 53-176 of this Article have been charged, contracted for, or received, shall be enforced in this State. This subsection, however, does not apply to loan contracts in which all contractual activities, including solicitation, discussion, negotiation, offer, acceptance, signing of documents, and delivery and receipt of funds, occur entirely outside this State."

(b) "If any lender or agent of a lender that makes loan contracts outside this State in the amount or of the value of twenty-five thousand dollars ($25,000) or less, comes into this State to solicit or otherwise conduct activities in regard to such loan contracts, then such lender is subject to the requirements of this Article."

66. N.C. Gen. Stat. § 24-2.1(a)-(c) states:

   (a) For purposes of this Chapter, any extension of credit shall be deemed to have been made in this State, and therefore subject to the provisions of this Chapter if the lender offers or agrees in this State to lend to a borrower who is a resident of this State or if such borrower accepts or makes the offer in this State to borrow, regardless of the situs of the contract as specified therein.

   (b) Any solicitation or communication to lend, oral or written, originating outside of this State, but forwarded to and received in this State by a borrower who is a resident of this State, shall be deemed to be an offer or agreement to lend in this State.

   (c) Any solicitation or communication to borrow, oral or written, originating within this State, from a borrower who is a resident of this State, but forwarded to, and received by a lender outside of this State, shall be deemed to be an acceptance or offer to borrow in this State.

67. The Individual Defendants seek to treble the penalty they allege is owed to them under the NC Consumer Finance Act and recover attorney's fees under the NC UDPTA, which states "if damages are assessed . . . judgment shall be rendered . . . for treble the amount fixed by the verdict" (N.C. Gen. Stat. § 75-16) and "[i]n any suit instituted by a person who alleges that the defendant violated G.S. § 75-1.1, the presiding judge may, in his discretion, allow a reasonable attorney fee." (N.C. Gen. Stat. § 75-16.1.)

68. Together these statutes—N.C. Gen. Stat. §§ 24-2.1(a)-(c), 53-190, and 75-1.1, et seq.—are sometimes referred to in this Complaint as "North Carolina Loan Statutes."

69. TM-SC seeks a declaration and determination that the North Carolina Loan Statutes violate the United States Constitution, both on their face and as applied to TM-SC and its loan agreements with Individual Defendants (including through the enforcement of North Carolina consumer finance laws). TM-SC is a licensed South Carolina title lender and did not enter North Carolina to solicit or conduct activities with respect to Individual Defendants' loan agreements at issue.

j.     All contractual activities relating to Individual Defendants' loans, including solicitation, discussion, negotiation, offer, acceptance, signing of documents, and delivery and receipt of funds, occurred entirely outside of North Carolina.

k.     Neither TM-SC nor any of its agents or employees entered North Carolina to solicit or otherwise conduct activities in regard to any of Individual Defendants' loan contracts.

l.     TM-SC did not make any offer or agreement in North Carolina to lend to a borrower (including any Defendant) who is a resident of North Carolina.

m.     No borrower (including any Defendant) accepted or made an offer in North Carolina to borrow from TM-SC.

n.     TM-SC did not make any solicitation or communication to lend, oral or written, to any borrower (including to any Defendant) originating outside of North Carolina that it then forwarded or caused to be forwarded to and received in North Carolina by a borrower who is a resident of North Carolina.

o.     TM-SC did not receive or accept from a borrower who is a resident of North Carolina (including from any Defendant) an offer to borrow or a solicitation or communication to borrow, oral or written, that originated within North Carolina.

70.     TM-SC further seeks an injunction against the North Carolina Attorney General's threatened enforcement of the unconstitutional North Carolina Loan Statutes.

## THE DECLARATORY JUDGMENT ACT

71.     "The Declaratory Judgment Act provides that, '[i]n a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal

relations of any interested party seeking such declaration, whether or not further relief is or could be sought.'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007) (quoting 28 U.S.C. § 2201(a)). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *United Prop. & Cas. Ins. v. D'Ambrosio*, No. 9:19-CV-547-BHH, 2020 WL 6434786, at *2 (D.S.C. Nov. 2, 2020) (quoting *Maryland Cas. Co. v. Pac. Coal & Oil Co*., 312 U.S. 270, 273 (1941).).

72.     Under the Declaratory Judgment Act, a party may seek relief from the enforcement of an unconstitutional statute. Where the threatened (or actual) enforcement takes the form of statutory claims brought by a private party, the party facing those claims may challenge the constitutionality of those statutes through independent claims for declaratory relief. As one district court in this Circuit has explained, "[a party's] assertions that [the relevant statutes] are unconstitutional[] . . . are inherently different than those raised by [the party seeking to enforce the statutes], which simply allege an illegal course of behavior under statutes which are assumed to be valid." *Joe Hand Promotions, Inc. v. Hayes*, No. 1:18CV531, 2019 WL 4246646 (M.D.N.C. Sept. 6, 2019). While the former concerns whether the statutes were violated, the latter "requests an answer to a different question entirely: whether . . . the statutes at hand [are] unconstitutional[.]" *Id*.

73.     Moreover, a claim seeking a declaration that a statute is unconstitutional under the Declaratory Judgment Act is independent and distinct from other claims challenging the constitutionality of state action, such as a claim for a constitutional deprivation under 42 U.S.C. § 1983. *See Noatex Corp. v. King Const. Co. of Houston*, 609 F. App'x 164, 167-68 (5th Cir. 2015)

(distinguishing between claim against private defendant for declaration that state statute is unconstitutional under Declaratory Judgment Act and claim challenging state action under § 1983).

74.     Here, the North Carolina Attorney General has threatened enforcement of the unconstitutional North Carolina Loan Statutes and the Individual Defendants have not only threatened, but actually brought, statutory claims against TM-SC. Accordingly, the Declaratory Judgment Act permits TM-SC to seek appropriate declaratory relief against both the North Carolina Attorney General and the Individual Defendants, in additional to appropriate injunctive relief available at law.

**FIRST CAUSE OF ACTION**
**(Against the Individual Defendants and the North Carolina Attorney General)**
**(Claim for Declaratory Judgment and Injunctive Relief Under the Due Process Clause of the Fourteenth Amendment to the United States Constitution)**

75.     TM-SC incorporates the allegations of paragraphs 1 through 74 as if fully set forth herein.

76.     TM-SC is entitled to a declaratory judgment that the application of the NC Consumer Finance Act, the NC Usury Law, or the NC UDTPA to these South Carolina loans violates TM-SC's substantive and procedural due process rights under the Fourteenth Amendment to the United States Constitution.

77.     There is a real, substantial, and present dispute between parties with adverse interests: TM-SC, on one hand, and the Individual Borrowers and the State of North Carolina, on the other hand.

78.     As a result of the North Carolina Attorney General's threatened enforcement of the North Carolina Loan Statutes and Individual Borrowers' claims compelled to arbitration against TM-SC under the North Carolina Loan Statutes, this controversy is of sufficient immediacy and

reality to warrant the issuance of a declaratory judgment. A declaration of the parties' respective rights and obligations would resolve the controversy between the parties.

79.    Because the Individual Defendants' enforcement actions compelled to arbitration hinge on the validity of the challenged statutes, a declaration that the statutes are unconstitutional would redress the imminent threat of civil liability.

80.    More specifically, the State of North Carolina does not have the authority to regulate lending occurring entirely outside of its borders or to enact procedural rules governing the enforcement of agreements in South Carolina courts.

81.    The application of the NC Consumer Finance Act, the NC Usury Law, or the NC UDTPA to TM-SC regarding its loan agreements with Individual Defendants would deprive TM-SC, without due process, of its right to property and interfere with its right to freely contract. The North Carolina Attorney General cannot enforce the North Carolina Loan Statutes against TM-SC and the Individual Borrowers cannot obtain relief under the North Carolina Loan Statutes from TM-SC without unconstitutionally depriving TM-SC of this right.

82.    Even if North Carolina has substantial contact with the parties' transactions, the North Carolina Loan Statutes still may not be applied because, after weighing the considerable interests of South Carolina at play, North Carolina's interest is insufficient to justify the application of North Carolina law to these transactions.

83.    Moreover, a fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required. This requirement of clarity in regulation is essential to due process protections and requires the invalidation of laws that are impermissibly vague.

84.     The North Carolina Loan Statutes, which impose penalties for statutory violations (including forfeiture and treble damages), if interpreted to penalize TM-SC, do not provide fair notice of the forbidden conduct. For instance, the North Carolina Loan Statutes purport to impose severe penalties on out-of-state lenders who offer proscribed loans unless all "contractual activities" occur outside of North Carolina "including solicitation, discussion, negotiation, offer, acceptance, signing of documents, and delivery and receipt of funds." The statute uses precise enumerated categories of "contractual activities" limited to the formation of the contract and delivery of funds. The statute does not provide fair notice that post-contractual filing of liens or repossession of vehicles in North Carolina would subject a lender to penalties. Therefore, interpreting the North Carolina Loan Statutes to apply to and penalize TM-SC would violate TM-SC's due process rights and would be unconstitutional.

85.     Therefore, TM-SC is entitled to a declaratory judgment that the NC Consumer Finance Act, the NC Usury Law, or the NC UDTPA, as applied to TM-SC and its loan agreements with Individual Defendants, are unconstitutional and violate the Fourteenth Amendment.

86.     Further, the North Carolina Attorney General should be enjoined from enforcing the unconstitutional North Carolina Loan Statutes against TM-SC. The North Carolina Attorney General's threatened enforcement of the statutes against out-of-state lenders such as TM-SC, on the basis of acts occurring outside of North Carolina, would violate the Fourteenth Amendment, and injunctive relief is appropriate to prevent the future harm associated with this violation of the Constitution.

## SECOND CAUSE OF ACTION
**(Against Individual Defendants and North Carolina Attorney General)**
**(Claim for Declaratory Judgment and Injunctive Relief Under the First and Fourteenth Amendments to the United States Constitution)**

87.    TM-SC incorporates the allegations of paragraphs 1 through 86 as if fully set forth herein.

88.    There is a real, substantial, and present dispute between parties with adverse interests: TM-SC, on one hand, and the Individual Borrowers and the North Carolina Attorney General, on the other hand.

89.    As a result of the North Carolina Attorney General's threatened enforcement of the North Carolina Loan Statutes and Individual Borrowers' claims compelled to against TM-SC under the North Carolina Loan Statutes, this controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. Such a declaration of the parties' respective rights and obligations would resolve the controversy between the parties.

90.    Because the Individual Defendants' enforcement actions in arbitration hinge on the validity of the challenged statutes, a declaration that the statutes are unconstitutional would redress the imminent threat of civil liability.

91.    More specifically, under the First Amendment to the United States Constitution (as applied to the states through the Fourteenth Amendment), TM-SC has a constitutional right to free speech, including commercial speech, free from prior restraint and regulation by North Carolina statute.

92.    Under those provisions of the Constitution, TM-SC is guaranteed the right to free association and contracting with others, free from regulation or restriction by the state of North Carolina. By attempting to broadly regulate the "solicitation, discussion, and negotiation" and "communication to lend," as well as other "contractual activities"—the full range of which cannot

24

be reasonably ascertained—by TM-SC and other persons, the North Carolina Loan Statutes purport to regulate speech and have an impermissible chilling effect on speech, including TM-SC's speech.

93.     North Carolina has no valid interest in preventing North Carolina residents from hearing about TM-SC's South Carolina-based lending programs, which are lawful in South Carolina, where TM-SC operates and where the underlying commercial transactions take place.

94.     Even if North Carolina had a valid interest in regulating speech, including TM-SC's speech, the regulatory technique it uses does not directly advance whatever that interest may be, and the regulatory technique is excessively, improperly, and unlawfully disproportionate to whatever interest might be served. Thus, the North Carolina Loan Statutes are excessive, overbroad, and impermissibly vague, and cannot survive. They are unconstitutional on their face.

95.     The NC Consumer Finance Act, the NC Usury Law, or the NC UDTPA are also unconstitutional as applied to TM-SC and its loan agreements with Individual Defendants. Those laws purport to impose monetary liability upon and punish TM-SC for its speech and associations. Applying the NC Consumer Finance Act, the NC Usury Law, or the NC UDTPA to prevent the enforcement of the parties' loan agreements and/or to impose monetary liability upon TM-SC would punish TM-SC for its speech and associations.

96.     TM-SC is entitled to a declaratory judgment that the NC Consumer Finance Act, the NC Usury Law, or the NC UDTPA, on their face and as applied to TM-SC and its loan agreements with Individual Defendants, which were negotiated and entered into in compliance with South Carolina's laws and inside its borders, violate TM-SC's right to free speech and association under the First and Fourteenth Amendments to the United States Constitution.

97.     Further, the North Carolina Attorney General should be enjoined from enforcing the unconstitutional North Carolina Loan Statutes against TM-SC. The North Carolina Attorney General's threatened enforcement of the statutes against TM-SC, and lenders such as TM-SC, would violate the First and Fourteenth Amendments, and injunctive relief is appropriate to prevent the future harm associated with this violation of the Constitution.

### THIRD CAUSE OF ACTION
#### (Against Individual Defendants and North Carolina Attorney General )
#### (Claim for Declaratory Judgment and Injunctive Relief Under the Full Faith and Credit Clause of the United States Constitution)

98.     TM-SC incorporates the allegations of paragraphs 1 through 97 as if fully set forth herein.

99.     There is a real, substantial, and present dispute between parties with adverse interests: TM-SC, on one hand, and the Individual Borrowers and the North Carolina Attorney General, on the other hand.

100.     As a result of the North Carolina Attorney General's threatened enforcement of the North Carolina Loan Statutes and Individual Borrowers' claims compelled to arbitration against TM-SC under the North Carolina Loan Statutes, this controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. Such a declaration of the parties' respective rights and obligations would resolve the controversy between the parties.

101.     Because the Individual Defendants' enforcement actions in arbitration hinge on the validity of the challenged statutes, a declaration that the statutes are unconstitutional would redress the imminent threat of civil liability.

102.     More specifically, South Carolina has the authority to regulate lending activity physically occurring within its borders.

103.    As set forth above, all the relevant activity in the negotiation and execution of the Loan Agreements occurred physically in South Carolina, and TM-SC has not taken any substantial action in North Carolina in connection with the Loan Agreements.

104.    South Carolina has a legitimate, substantial interest in regulating the lending of money within its borders.

105.    TM-SC's loan agreements with Individual Defendants fully comply with South Carolina's regulations and laws. Through the North Carolina Loan Statutes, North Carolina has adopted a policy of hostility to the public acts of South Carolina and other states.

106.    TM-SC is entitled to a declaratory judgment that the application of the NC Consumer Finance Act, the NC Usury Law, or the NC UDTPA would violate the Full Faith and Credit Clause of the United States Constitution, as it would invalidate South Carolina's right and authority to regulate lending within its borders.

107.    Further, the North Carolina Attorney General should be enjoined from enforcing the unconstitutional North Carolina Loan Statutes against TM-SC. The North Carolina Attorney General's threatened enforcement of the statutes against out-of-state lenders such as TM-SC, on the basis of acts occurring outside of North Carolina, would violate the Full Faith and Credit Clause, and injunctive relief is appropriate to prevent the future harm associated with this violation of the Constitution.

**FOURTH CAUSE OF ACTION**
**(Against Individual Defendants and North Carolina Attorney General )**
**(Claim for Declaratory Judgment and Injunctive Relief Under the Commerce Clause**
**Based on Invalid Extraterritorial Application of the North Carolina Consumer**
**Finance Act)**

108.    TM-SC incorporates the allegations of paragraphs 1 through 107 as if fully set forth herein.

109.    There is a real, substantial, and present dispute between parties with adverse interests: TM-SC, on one hand, and the Individual Borrowers and the North Carolina Attorney General, on the other hand.

110.    As a result of the North Carolina Attorney General's threatened enforcement of the North Carolina Loan Statutes and Individual Borrowers' claims compelled to arbitration against TM-SC under the North Carolina Loan Statutes, this controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. Such a declaration of the parties' respective rights and obligations would resolve the controversy between the parties.

111.    Because the Individual Defendants' enforcement actions in arbitration hinge on the validity of the challenged statutes, a declaration that the statutes are unconstitutional would redress the imminent threat of civil liability.

112.    More specifically, the Commerce Clause prohibits the State of North Carolina from applying its laws out of state to regulate commerce conducted outside the State of North Carolina.

113.    The North Carolina Loan Statutes seek to govern lending activities that are occurring solely within South Carolina.

114.    The North Carolina Loan Statutes impose a burden on interstate commerce that is clearly excessive of any legitimate governmental interest North Carolina may have in regulating lending activities occurring exclusively within South Carolina.

115.    Moreover, the North Carolina Loan Statutes are procedural statutes governing the enforcement of agreements in North Carolina courts. Applying procedural statutes to claims filed in South Carolina courts would further violate the Commerce Clause.

116.    TM-SC is entitled to a declaration that the application of the NC Consumer Finance Act, the NC Usury Law, or the NC UDTPA to TM-SC's loan agreements with Individual

Defendants would violate the Commerce Clause, as doing so would interfere with commercial activity occurring exclusively in South Carolina.

117.    Further, the North Carolina Attorney General should be enjoined from enforcing the unconstitutional North Carolina Loan Statutes against TM-SC. The North Carolina Attorney General's threatened extraterritorial enforcement of the statutes against out-of-state lenders such as TM-SC, on the basis of acts occurring outside of North Carolina, would violate the Commerce Clause, and injunctive relief is appropriate to prevent the future harm associated with this violation of the Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, TM-SC respectfully requests that this Court enter a declaratory judgment ordering the following relief:

A.  A Declaration that the NC Consumer Finance Act, the NC Usury Law, or the NC UDTPA violate the Due Process Clause of the United States Constitution;

B.  A Declaration that the application of the NC Consumer Finance Act, the NC Usury Law, or the NC UDTPA to TM-SC or its loan agreements entered into with the Individual Defendants violates the Due Process Clause of the United States Constitution;

C.  A Declaration that the NC Consumer Finance Act, the NC Usury Law, or the NC UDTPA violate the First and Fourteenth Amendments to the United States Constitution;

D.  A Declaration that the application of the NC Consumer Finance Act, the NC Usury Law, or the NC UDTPA to TM-SC or its loan agreements entered into with the Individual Defendants violates the First and Fourteenth Amendments to the United States Constitution;

E.  A Declaration that the application of the NC Consumer Finance Act, the NC Usury law, or the NC UDTPA to TM-SC or to the Loan Agreements entered into with the Individual Defendants violates the Full Faith and Credit Clause of the United States Constitution;

F.  A Declaration that the application of the NC Consumer Finance Act, the NC Usury Law, or the NC UDTPA to TM-SC or to the Loan Agreements entered into with the Individual Defendants violates the Commerce Clause of the United States Constitution;

G.  An Order holding that the NC Consumer Finance Act, the NC Usury law, and the NC UDTPA shall not be applied to TM-SC or to the Loan Agreements entered into with the TM-SC;

H.  An Order enjoining the North Carolina Attorney General from enforcing the NC Consumer Finance Act, the NC Usury law, or the NC UDTPA due to the foregoing violations of the Constitution; and

I.  For such other and further relief as this Court deems just and appropriate.


*[Signature block on following page]*

Dated: January 30, 2026

Respectfully submitted,

**GALLIVAN, WHITE & BOYD, P.A.**

s/John T. Lay, Jr.
John T. Lay, Jr. (Fed ID 5539)
Jordan M. Crapps (Fed ID 12418)
J. Clayton Mitchell (Fed ID 1739)
PO Box 7368
Columbia, SC 29202-7368
jlay@gwblawfirm.com
jcrapps@gwblawfirm.com
cmitchell@gwblawfirm.com
(803) 779-1833 Ofc

-and-

**VENABLE LLP**
*Pro hac vice applications to be submitted*
Abram I. Moore
Daniel J. Hayes
Nelson M. Hua
Nicole E. Feldman
227 West Monroe St., Suite 1900
Chicago, IL 60606
(312)-820-3439

*Attorneys for Plaintiff*
*TitleMax of South Carolina, Inc.*